Filed 3/19/14  In re Destiny E. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re DESTINY E., a Person Coming Under the Juvenile Court Law. | B249891 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK84000) |
|     Plaintiff and Respondent, | |
| v. | |
| LISA C., | |
|     Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County. Amy Pellman, Referee.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Ownes, Assistant County Counsel, Jessica S. Mitchell, Deputy County Counsel for Respondent.

_____

Lisa C. (mother) appeals from the orders denying her Welfare and Institutions Code section 388 petition and terminating her parental rights.[1] She contends: (1) denial of her section 388 petition was an abuse of discretion; (2) the findings that Destiny was adoptable and that the exception to termination of parental rights did not apply were not supported by substantial evidence. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Destiny was two months old on September 5, 2010, when she came to the attention of the Department of Children and Family Services (DCFS) as the result of a referral alleging that mother left Destiny with maternal grandmother, mother's whereabouts were unknown and maternal grandmother had physically abused Destiny by cutting Destiny's fingernails without regard to the fact that her fingers were bleeding and she was crying. By the time an investigating social worker arrived at maternal grandmother's apartment later that day, mother had picked up Destiny and maternal grandmother did not know where they were; she did not have an address for mother, who was absent without leave (AWOL) from a juvenile probation placement.[2] When the social worker returned two days later, on September 7, Destiny was at the apartment. Since mother's whereabouts were unknown, Destiny was detained.

On November 30, mother submitted to juvenile court jurisdiction. As sustained, the second amended section 300 petition alleged:

> **Count B-4**: Mother "has a history of substance abuse and is a current abuser of marijuana, which renders the mother incapable of providing the child with regular care and supervision. The mother's abuse of illicit drugs endangers the child's

---

[1] All future undesignated statutory references are to the Welfare and Institutions Code.

[2] Mother was 14 years old in February 2007 when she was first declared a ward of the court within the meaning of section 602. In April 2010, mother was 17 years old when she was arrested on firearm charges and returned to placement. In June 2010, mother was declared AWOL and a bench warrant was issued. Destiny was born in July 2010.

2

physical and emotional health and safety and places the child at substantial risk of serious physical harm."

**Count B-5**: Mother "has a criminal history of convictions of possession of a concealable firearm and force with a deadly weapon – firearm on person, and is currently incarcerated in juvenile hall which limits her ability to care for the minor. Such criminal history and inability to care for the minor on the part of [mother] places the child at substantial risk of serious physical harm."[3]

On December 3, 2010, Destiny was placed with maternal cousin Deila Q. and her live-in boyfriend. The boyfriend later moved out when his criminal history put the placement in jeopardy. Meanwhile, Destiny was receiving weekly occupational therapy to address physical developmental delays that were believed to be the result of neglect prior to the time she was detained. Following a December 28, 2010, disposition hearing, Destiny remained placed with Delia and the matter was continued to June 14, 2011, for a section 366.21, subdivision (e) review hearing (.21 hearing).

For the .21 hearing, DCFS reported Destiny was doing well with Delia. Mother had been released from community camp and was residing with maternal grandmother. Mother's visits with Destiny were consistent and she had participated in her case plan to the extent possible while in camp. Mother's probation officer praised mother's progress. Finding mother had made significant progress in resolving the problems that led to Destiny's removal, and that there was a substantial probability that Destiny could be returned home within six months, the juvenile court continued the .21 hearing to December 13, 2011.

For the continued .21 hearing, DCFS reported that Destiny was doing well and had established a bond with Delia. Delia wanted to adopt Destiny if reunification failed.

---

**3** As sustained, count B-2 of the second amended petition alleged that Destiny's father "has a history of marijuana use which periodically limits the father's ability [to provide] the child with regular care and supervision. The father's history of marijuana use places the child at substantial risk of serious physical harm." Father was an active gang member involved in using and selling illegal drugs. He was incarcerated during much of the dependency and his reunification services were terminated on August 24, 2011. Father did not challenge that order and is not a party to this appeal.

Mother's probation had ended but she was still living with maternal grandmother while completing her court-ordered programs and trying to obtain a high school diploma. Mother's drug tests were mixed – some negative tests, some no-shows and two positive tests for marijuana. Mother had inconsistently attended a parenting class until a month before the hearing, when her attendance became more consistent. Mother's visits with Destiny were inconsistent. DCFS recommended terminating mother's reunification services. The .21 hearing was continued to February 7, 2012.

According to a Last Minute Information For Court Officer filed on the day of the continued .21 hearing, mother continued to attend individual counseling, she completed 22 sessions of a parenting program, submitted two negative drug tests and was exhibiting a better attitude. Finding mother had not made significant progress in resolving the problems that led to Destiny's removal, the juvenile court terminated mother's reunification services and set the matter for a section 366.26 permanent plan hearing (.26 hearing) on June 5, 2012. Mother did not challenge that ruling.

Mother did not remain drug free over the next several months. She was a "no-show" at drug tests on March 27, April 11, May 16 and June 15, 2012. On April 23 and May 4, 2012, mother tested positive for marijuana. Mother was arrested on May 12 for being under the influence; she was hospitalized and tested positive for methamphetamines and marijuana. The criminal court ordered mother to complete a substance abuse program, notwithstanding the program she had completed as part of her case plan.

According to the report for the .26 hearing on June 5, 2012, Destiny continued to flourish in her placement with Delia. Destiny's weekly physical therapy had ended but she was still receiving developmental services. Destiny's preschool teacher and school administrator reported that Destiny was doing well in school and they had no concerns. The report described Destiny as a "happy child" and "a content, curious toddler who likes to engage with her surroundings. She likes to play with keys, toys, and loves listening to music and will dance when she hears it being played." Destiny had normal eating and sleeping patterns and good overall health. Regarding the likelihood of adoption, the

4

report focused on concerns about Delia's ongoing relationship with her boyfriend, who had picked up another criminal conviction in January 2012, which caused DCFS to question whether Delia's adoption home study would be approved. Following DCFS's recommendation, the juvenile court continued the .26 hearing to October 2, 2012.

On July 23, 2012, mother filed the first of three section 388 petitions seeking to change the placement order to home of mother. As changed circumstances, mother pointed to her completion of a year-long program that included parenting classes, anger management and domestic violence and substance abuse programs; she had also obtained a high school diploma and was actively seeking a job. Mother maintained the change would be in Destiny's best interest because there was no approved adoptive home, mother had consistently visited, the visits went well and mother had become "more active with changing diapers, holding, feeding and walking with Destiny." Although the juvenile court set the petition for hearing, mother withdrew the petition on the date of the hearing. The juvenile court gave DCFS discretion to increase mother's visits in duration, but not to lift the monitor.

The report for the .26 hearing on October 2, 2012, stated that Destiny continued to thrive in her placement with Delia. Destiny had graduated from her developmental services program the prior June and was now "developing at an age appropriate level." The adoptability assessment focused on Delia, who had ended her relationship with the boyfriend whose criminal history had become a barrier to approving an adoption home study, although they still communicated. DCFS recommended another six-month continuance to further monitor the situation. The day of the hearing, mother filed a second section 388 petition seeking a home of mother placement or, in the alternative, unmonitored weekend and overnight visits. The change in circumstance and best interest arguments were the same as for the withdrawn section 388 petition with the addition that mother was now employed. The petition was set for hearing on November 2 and the .26 hearing was continued to the same day.

According to DCFS's report for the section 388 hearing, mother had two months of negative drug tests, had obtained employment and was consistently visiting Destiny.

5

DCFS opposed placing Destiny with mother but recommended unmonitored visits along with continued drug testing. The juvenile court ordered unmonitored visits for mother, with DCFS discretion to liberalize to weekends and overnights with the approval of Destiny's counsel. It continued the .26 hearing to March 1, 2013.

For the continued .26 hearing, DCFS reported that Destiny was thriving. Delia wanted to adopt Destiny and had ended her relationship with the former boyfriend. The adoption home study had still not been approved because Delia had entered into a new relationship. A live scan showed no criminal history for the new boyfriend, but DCFS wanted to interview him more extensively. DCFS expected to successfully complete the home study within six to eight weeks. Meanwhile, mother's weekly eight-hour unmonitored visits with Destiny were going well. The day of the hearing, mother filed a third section 388 petition seeking a home of mother order or unmonitored weekend and overnight visits. The change in circumstances and best interest arguments were essentially the same as put forth in the first two section 388 petitions. The petition was set for hearing on April 17 and the .26 hearing was continued to May 20.

By the section 388 hearing on April 17 and 18, 2013, Destiny was three months shy of her third birthday on July 16, 2013. She had been removed from mother's custody for two years, seven months (since September 7, 2010) and had been living with Delia for two years, four months (since December 3, 2010). According to DCFS's report, the adoptive home study for Delia was "nearly complete." Mother had completed most of her court-ordered programs. She had been a "no-show" for drug tests on January 17 and February 14, but otherwise tested negative. Mother was unemployed, but had employable skills. She was still living with maternal grandmother, who reported that she, too, was now sober. DCFS recommended overnight visits, but no change in placement. At the hearing, the social worker testified that mother was pregnant by Destiny's father and DCFS was concerned about their relationship in light of father's unresolved substance abuse and ongoing criminality. Regarding mother's unmonitored visits, the social worker testified that Destiny was sometimes resistant to go with mother, but DCFS had no concerns about her well-being during the visits. Destiny called both mother and

6

Delia "Mommy" and although she had some attachment to mother, her main attachment was to Delia. The social worker was unable to say whether it would be in Destiny's best interest to order unmonitored overnight visits. Mother did not testify at the hearing. The juvenile court denied the petition, observing that Destiny had been in the dependency system for almost three years. During most of that time, mother continued using drugs even while participating in a substance abuse program. Of most concern to the court was the fact that mother was still in a relationship with father, who continued using and selling drugs, and was involved in a gang. The juvenile court concluded mother had not established either the requisite changed circumstances or that Destiny's best interests would be served by the proposed change.

At the .26 hearing on May 20, 2013, DCFS reported that Delia's adoptive home study had been approved. Mother testified that Destiny calls her, "Momma Lisa." In the prior six months, mother had missed just one visit, when she was in the hospital. Destiny is "kind of shy at first," but then she is "mostly happy" to see mother. During the unmonitored visits, mother changes and feeds Destiny; she assists with potty-training by asking Destiny every two hours whether she needs to use the restroom. Mother also reads and plays with Destiny. When she is not with Destiny, mother calls Delia to check on her. Mother did not know Destiny's pediatrician. She knew that Destiny had been to the doctor the week before for conjunctivitis. Destiny calls Delia "Mommy" or "Delia." Destiny's favorite toy is her "baby." Mother's counsel argued application of the section 366.26, subd. (c)(1)(B)(i) beneficial parental relationship exception to the preference for adoption and termination of parental rights and urged the court to select legal guardianship with Delia, rather than adoption, as the permanent placement plan. Destiny's counsel argued for termination of parental rights and adoption. While Destiny had a relationship with mother, it was not that of parent and child and the benefits of a permanent home outweighed those of maintaining the relationship with mother. DCFS agreed with Destiny's counsel. Concluding that the beneficial relationship exception did not apply, the juvenile court noted that mother had made strides, but that weekly visits

7

are not the same as parenting.  It terminated mother's parental rights, finding by clear and convincing evidence that Destiny was likely to be adopted.

Mother timely appealed from the April 18 and May 20 orders.

## DISCUSSION

*A.     Denial of Mother's Third Section 388 Petition Was Not An Abuse of Discretion*

Mother contends the juvenile court abused its discretion in denying her section 388 petition seeking to change Destiny's placement to home of mother or unmonitored overnight and weekend visits.  She argues that the petition showed changed circumstances (consistent negative drug tests, completion of a year-long drug program, earning her high school diploma, getting a job, consistently visiting Destiny and becoming more hands-on in taking care of Destiny) and that the proposed order was in Destiny's best interests (mother and Destiny were bonded).

Section 388 permits a parent to petition for a change of a previous order when the change would be in the child's best interests.[4]  The statute gives a parent one last chance to save a parent-child relationship following termination of reunification services but before termination of parental rights.  (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258; *In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1506–1508.)

To succeed on a section 388 petition, the parent must establish "by a preponderance of the evidence that (1) new or changed circumstances exist, and (2) the proposed change would promote the best interest of the child.  [Citation.]" (*In re S.J.* (2008) 167 Cal.App.4th 953, 959.)  "The parent bears the burden to show both a ' "legitimate change of circumstances" ' and that undoing the prior order would be in the best interest of the child.  [Citation.]  The petition is addressed to the sound discretion of

---

**4**     Section 388, subdivision (a) provides:  "Any . . . person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made . . . ."

the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion. [Citation.]" (*Id*. at pp. 959–960; see also *In re B.C.* (2011) 192 Cal.App.4th 129, 141.)

We find no abuse of discretion in the juvenile court's finding that mother failed to establish either changed circumstances or that the proposed change would promote Destiny's best interests. But for some additional visits, there had been no positive changes since the juvenile court denied mother's second section 388 petition – a ruling which mother did not challenge. On the contrary, notwithstanding mother's participation in substance abuse programs, she was still in a relationship with the father, who continued to pursue a life of criminality, including ongoing gang involvement as well as using and selling drugs. The poor judgment this shows on mother's part is enough to find that placing Destiny with mother, or giving her unmonitored weekend or overnight visits, would not promote Destiny's best interests.

## B. *Substantial Evidence Supported the Finding That Destiny Was Adoptable*

Mother contends the finding that Destiny was adoptable "lacked the careful assessment necessary to determine if she could be adopted by [Delia]." She argues that, "because Destiny was bonded to [Delia] and because no other people had been identified as willing to adopt, the court did not have sufficient evidence Destiny would be adopted within a reasonable period of time unless there was evidence [Delia] would be adopting the child."[5] We find no error.

At a .26 hearing, the juvenile court has four choices. In order of preference, those choices are: "(1) terminate parental rights and order that the child be placed for adoption (the choice the court made here); (2) identify adoption as the permanent placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian;

---

[5] To the extent mother complains about defects in the adoptability assessment, DCFS is correct that mother has waived those claims by not objecting below. (*In re Brian P.* (2002) 99 Cal.App.4th 616, 623.) She has not, however, waived the failure of proof claim. (*Ibid*.)

9

or (4) order long-term foster care. (§ 366.26, subd. (b).) . . . 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) For this reason, whenever the court finds "by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).) To meet the "clear and convincing" standard, "the court must merely determine that it is 'likely' that the child will be adopted within a reasonable time. [Citations ]" (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.) On appeal, the "clear and convincing" test disappears and we review the adoptability finding for substantial evidence. (*In re E.B.* (2010) 184 Cal.App.4th 568, 578.)

"The question of adoptability usually focuses on whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child. [Citation.] If the child is considered *generally* adoptable, we do not examine the suitability of the prospective adoptive home. [Citation.]" (*In re Valerie W.* (2008) 162 Cal.App.4th 1, 12 (*Valerie W.*), italics added.) A child's placement with a prospective adoptive parent is substantial evidence of *general* adoptability. (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1313.) Even if special needs render a child not *generally* adoptable, "a finding of adoptability can nevertheless be upheld if a prospective adoptive family has been identified as willing to adopt the child and the evidence supports the conclusion that it is reasonably likely that the child will in fact be adopted within a reasonable time. [Citations.]" (*K.B, supra*, 173 Cal.App.4th at pp. 1292-1293.)

Here, by all accounts Destiny was a happy, healthy almost three year old. She had been placed with Delia for more than two years, Delia wanted to adopt her and an adoptive home study of Delia's home had been approved. This constituted substantial evidence that Destiny was generally adoptable.

*M*other's reliance on *Valerie W., supra*, for a contrary result is misplaced. In *Valerie W.*, a mother and daughter intended to jointly adopt two siblings but there was no approved home study for the daughter. Because there was no indication that the mother

10

wanted to adopt alone, the appellate court found the lack of information about the daughter rendered the assessment inadequate. (*Valerie W., supra,* 162 Cal.App.4th at p. 15.) *Valerie W.* is inapposite to this case because Delia intends to adopt Destiny alone, and there was an approved home study for Delia. Additionally, *Valerie W.* involved siblings, one of whom appeared to have special needs that were not addressed in the assessment. Here, although Destiny had some developmental issues as an infant, those issues had been successfully treated and by the time of the .26 hearing nothing about Destiny's age, physical or emotional health rendered her anything other than generally adoptable.

## C.     *There Was No Evidence that the "Beneficial Parental Relationship" Exception to the Preference For Adoption Applied*

Mother challenges the sufficiency of the evidence to support the juvenile court's finding that the beneficial parental relationship exception to the preference for adoption did not apply. She argues the evidence established a bond between mother and Destiny that required application of the exception.

Most appellate courts apply a substantial evidence standard of review to the trial court's determination of whether a section 366.26 statutory exception applies. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) Some courts have applied the abuse of discretion standard of review. (See, e.g., *In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1512.) The practical differences between the two standards are not significant (*Jasmine D.* at p. 1351), and under either standard, we would affirm.

The Legislature has recognized that adoption is not the appropriate plan in every case. (§ 366.26, subds. (b)(1) & (c)(1).) An exception exists when the child has a strong bond with the parent and severing that bond would be detrimental to the child. (§ 366.26, subd. (c)(1)(B)(i); see *In re S.B.* (2008) 164 Cal.App.4th 289, 299 ["The exception [to the preference for adoption] may apply if the child has a 'substantial positive emotional attachment' to the parent."].) This exception applies when " '[t]he court finds a compelling reason for determining that termination would be detrimental to the child'

11

(§ 366.26, subd. (c)(1)(B)) because '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i).)' " (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.) "The 'benefit' prong of the exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citations.] No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' [Citations.] The relationship that gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.' [Citation.] Moreover, '[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' [Citation.]" (*Id.* at p. 621.)

The parents bear the burden of showing that termination of parental rights would be detrimental to the child. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.) A showing that the child would derive some benefit from continuing a relationship with the parent through visitation is not enough to derail an adoption. The exception is not "a mechanism for the parent to escape the consequences of having failed to reunify." (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1348.)

In *In re S.B., supra,* 164 Cal.App.4th at page 301, the reviewing court found that the only reasonable inference from the record, which included a bonding study, was that the child would be greatly harmed by the loss of the parental relationship. By contrast, in *In re C.B.* (2010) 190 Cal.App.4th 102, 125, where there was no bonding study or other expert evidence of detriment, the court concluded that the undisputed fact that the children loved the mother was insufficient to establish the exception.

12

Here, mother has failed to show that maintaining her relationship with Destiny outweighs the benefits Destiny would gain in a permanent home with an adoptive parent. There was no evidence that Destiny had a substantial emotional bond with mother. On the contrary, the evidence was that Destiny was hesitant to go with mother on unmonitored visits. And there was no evidence that Destiny was upset when she left mother at the end of those visits. There was no bonding study or any other expert evidence that terminating mother's parental rights would be detrimental to Destiny. These facts do not show that this is the extraordinary case in which the beneficial relationship exception applies.

## DISPOSITION

The April 18, 2013 order denying mother's section 388 petition and the May 20, 2013 order terminating mother's parental rights are affirmed.


RUBIN, ACTING P. J.

WE CONCUR:


FLIER, J.


GRIMES, J.

13